TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-98-00528-CR







Robert Kyle Morris, Appellant



v.



The State of Texas, Appellee







FROM THE DISTRICT COURT OF BASTROP COUNTY, 21ST JUDICIAL DISTRICT


NO. 8798, HONORABLE THOMAS G. KENYON, JUDGE PRESIDING







 Appellant Robert Kyle Morris was convicted in a jury trial of the offense of
aggravated assault with a deadly weapon. See Tex. Penal Code Ann. § 22.02(a)(2) (West 1994). 
The trial court assessed appellant's punishment at imprisonment for 16 years.

 Appellant asserts that the trial court erred in unreasonably limiting jury voir dire,
in denying appellant's challenge of a venireman for cause, and in admitting inadmissible evidence
at the punishment phase of trial. We will sustain appellant's first point of error. The judgment
will be reversed and the cause remanded to the trial court.

 Although appellant does not contest the sufficiency of the evidence, a statement of
some of the facts is necessary to an understanding of the discussion of appellant's point of error. 
The 19-year-old appellant was an avowed devil worshipper. He believed that most people were
devil worshippers. He felt that God was not all-powerful and needed the help of Lucifer, the
devil. Appellant and the young woman victim became friends when they worked at a fast food
restaurant. The victim testified that they were not romantically involved; but together, they had
attended a concert in Austin and two movies. When they attended the concert in Austin, appellant,
a frequent cross-dresser, wore a wig and woman's clothing. The victim was not shocked, she
testified, because to her generation it was not shocking to see cross-dressers in Austin.

 On September 24, 1997, the victim was employed by an automobile dealer as a file
clerk. That evening when she was leaving work and planning to attend church, she found a note
from appellant in her car seat. As she finished reading the note, appellant drove up and parked
near her car. He asked her to go with him and she got into his car. While he drove, he told her
that he was very tired and cold and that he had not slept for days because a spirit had entered his
body and was haunting him. After driving several miles, appellant drove into a cemetery telling
the victim that the only person who could get the spirit out of him was a high priestess who lived
in the cemetery. The victim testified that she "kind of believed him because [she did] believe that
people can be possessed." Appellant parked his car and they started to walk toward a house in
back of the cemetery. They were in a secluded area and out of sight from those who might be on
the road. They walked to a fence in back of the house. While she was looking at the house and
thinking about what might happen, appellant came up behind her, put his arms around her, and
thanked her for coming with him. Appellant asked her to close her eyes and turn around. The
victim then felt a very sharp pain in her back. She thought appellant had "punched her really
hard." She turned around and saw appellant holding a knife. Appellant said the knife always
looked better with fake blood on it. She put her hand behind her and when she drew it back it was
covered with blood. She asked appellant why he was doing this. He told her that he wanted to
kill her so that he could become a witch. Appellant told the victim that she was not a good
Christian. They started to walk towards the road, and the victim told appellant that it was not her
time to die. Appellant said that she would be getting weak soon because she was losing a lot of
blood and that she might as well give up. Then in the words of the victim's testimony:


 And after I kept telling him that it wasn't my time to go because I didn't
know if I was going to go to heaven or hell, he told me that he was raised in a
Baptist home and the only thing that he knew to do was to get down on my knees
and start praying to the Lord and asking for forgiveness and really meaning it.


 And I thought that was the end of it, and I didn't care, you know, what I
had to do. So I got down on my knees in front of this guy who had a knife and was
trying to kill me, you know. I got down on my knees and started praying to the
Lord to forgive me for all my sins, you know, and admit me into heaven or
whatever if he killed me.


 And he actually -- Kyle threw down his knife behind him, and he's sitting
there basically preaching to me when I was on my knees. And I just -- I didn't feel
comfortable. I didn't feel any sort of resolve or anything as I was praying, so I got
back up, and he was just in his -- it wasn't my time to go, it was not my time to go. 
And he was telling me that it was my time to go and where did I want it next.


 And at one point he came up to me and he took my arms and he spread
them to my side and he said, "Hold your wings up high," and he took a step back
away from me. And when he stepped back away from me, I put my arms down
because I wasn't going to stand there with my arms up and let this guy, you know,
come at me with a knife again.


 And after that happened, I can remember standing, and I was facing the
cemetery road and his back was to it. And I saw a car go up the cemetery road
back, like, away from the Farm Road 969 back farther to the cemetery, and I think
that he saw it also. And I kind of ran around him trying to get away, and when I
did, he grabbed me. And at some point there was a little struggle, and he got his
hand away from my breast and he slit my throat. And I think that after he slit my
throat I fell down on my back and --.


 Well, I was trying to get away at this point because I saw a car on the road. 
And after he slit my throat, I think I fell down on my back, and he was standing
over me with a knife. And my first reaction was to kick up, and I kicked him with,
I believe, my left foot. And I guess I kicked him so hard that my shoe fell off. 
And as soon as I kicked him, I flew back up and was on my feet, and I started
running. And I saw a truck driving down the cemetery road now, and the truck
was going away from the cemetery back onto Farm Road 969.


 And as I started running, I didn't get very far and Kyle came up behind me. 
And he turned me around and my back was against his chest and I had ahold of his
arm with the knife in his hand. And with his other hand he was shoving his fingers
down my throat while I was screaming trying to keep me from screaming.


 And somehow I got away from him. And when I got away from him, I just
started running again towards the road and this truck. And I said, "Stop," and the
man was out looking at Kyle's car. And while I was running I kind of turned
around and I saw Kyle throw his knife down and start, you know, kind of running
after me.


 And we got up to this man who was in his truck and I was just, you know,
telling him to take me to the hospital.



 During the trial, several witnesses testified, including law enforcement officers and
a DNA expert. Appellant offered extensive testimony of a psychiatrist and a psychologist. The
State offered the testimony of a psychologist. These experts agreed appellant was mentally ill and
dangerous, but disagreed on whether he was legally insane.

 In his first point of error, appellant urges that the trial court erroneously limited
defense counsel's jury voir dire examination to 45 minutes. In Ratliff v. State, 690 S.W.2d 597
(Tex. Crim. App. 1985), the court found reversible error because the trial court arbitrarily limited
voir dire to one hour even though the trial court extended that time for 21 minutes. See id. at 599. 
The Ratliff court quoted Mathis v. State, 576 S.W.2d 835, 836 (Tex. Crim. App. 1979), as
follows:


The right to be represented by counsel, guaranteed by Article 1, Section 10 of the
Texas Constitution, encompasses the right of counsel to question the members of
the jury panel in order to intelligently exercise his peremptory challenges. Mathis
v. State, 167 Tex.Cr.R. 627, 322 S.W.2d 629 (1959); De La Rosa v. State, 414
S.W.2d 668 (Tex.Cr.App.1967); Burkett v. State, 516 S.W.2d 147 (Tex.Cr.
App.1974); Hernandez v. State, 508 S.W.2d 853 (Tex.Cr.App.1974); Abron v.
State, 523 S.W.2d 405 (Tex.Cr.App.1975). The trial court, in its sound
discretion, can and should control the voir dire examination of the venire; ...



Ratliff, 690 S.W.2d at 599-600. The standard for appellate review in determining whether a trial
court has abused its discretion in limiting jury voir dire may be gleaned from Ratliff.


Under Ratliff, the appellate court must conduct a three prong test to consider
whether the trial judge abused his discretion by imposing a time limitation on voir
dire. The reviewing court must determine:


1. whether the party attempted to prolong the voir dire,


2. whether the questions that the party was not permitted to ask were proper voir
dire questions, and,


3. whether the party was not permitted to examine prospective jurors who actually
served on the jury.


Ratliff, 690 S.W.2d at 599-600.



McCarter v. State, 837 S.W.2d 117, 119 (Tex. Crim. App. 1992); see also Tobar v. State, 850
S.W.2d 182 (Tex. Crim. App. 1993). "[T]he right of counsel to question venire members and
the right of the trial court to control the voir dire and impose reasonable restrictions coexist and
must be harmonized." Ratliff, 690 S.W.2d at 599. "Each case must be examined on its own
facts. A reasonable time limitation for one case may not be reasonable for another." Id. at 600. 
The amount of time allotted is not, by itself, conclusive. Various and unpredictable considerations
such as the complexity of the case or the makeup of the venire may prolong voir dire examination. 
Challenges for cause and discussions at the bench can contribute to a lengthy voir dire
examination. See id. at 600.

 Immediately after the State started its voir dire examination, the trial court said to
the prosecutor: "Mr. Haymes, one thing I didn't discuss with counsel or announce to counsel is
that I would like each side to limit their voir dire to no more than 45 minutes." The record does
not reflect the exact time used by the State in voir dire, but presumably it was completed within
the 45-minute limitation. During defense counsel's voir dire, the trial court told defense counsel
that he had only five minutes left. After that time elapsed, defense counsel asked for more time
to question individual panel members who had indicated they were "having a problem with either
expert testimony or the insanity defense" and also "police officer testimony." Out of the presence
of the panel, counsel named for the court the panel members he wanted to question individually
because of the problems he had stated to the court. Counsel continued:


 And I think those are the questions, Judge, that we would ask the
prospective jurors if we were given additional time for voir dire. It would help us
delve into whether or not any of the jurors could be struck for cause or challenged
for cause and/or would assist us in being effective in representation of our client
by giving us additional information from which we can make our peremptory
challenges.


 THE COURT: What is the State's posture with reference to that?


 MR. HAYMES: Your Honor, it appears to the State that when Mr. Parks
. . . 


 THE COURT: I hate to interrupt you, but basically my question is, do you
agree with the defense's request in any respect?


 MR. HAYMES: No, I do not. I think he's had enough time.


 THE COURT: Okay. And I'll deny your request based upon the reasons
that I previously stated, which are that you made an election as to what matters you
would pursue in using your voir dire time, and that's a trial tactic and decision you
made but the Court has no control over it, and I'm not trying to control it. So your
request is denied.



 The record shows that panel members Mamie King, Billy Lamson, and Donna
Graham served as jurors. When the panel was being examined, Mamie King indicated she might
not trust expert witnesses who were paid a fee. If he had not been prevented by the court imposed
time limit, defense counsel told the court he would ask King why she would distrust expert
witnesses, whether or not she could set aside her opinion and give appellant a fair trial, and
whether she would be prejudiced against appellant for relying on expert witnesses in this case. 
"A statement of a potential juror that he has a problem with the law does not alone provide insight
into whether that potential juror can set aside personal feelings and follow the law." McCarter,
837 S.W.2d at 121.

 When the panel was questioned, Billy Lamson and Donna Graham said that they
knew Officer Earl Pence. Officer Pence had been introduced to the panel as a witness. During
the trial, Pence gave substantial, significant testimony. Defense counsel told the court that if not
prevented by the court's voir dire time limit he would inquire of Lamson and Graham of their
relationship to Pence and whether or not their relationship with Officer Pence would affect their
duty as jurors. In addition, the record shows defense counsel claimed to have used nine of the
defense's peremptory strikes against panel members that counsel was not allowed to question
individually about specified matters raised while the panel was being questioned. We conclude
that defense counsel was not allowed to ask proper voir dire questions of three panel members who
served on the jury. Therefore, appellant met the second and third Ratliff requirements. See also
Smith v. State, 703 S.W.2d 641, 643-45 (Tex. Crim. App. 1985); Clark v. State, 608 S.W.2d 667,
668-70 (Tex. Crim. App. 1980).

 Relative to the first Ratliff requirement, appellant argues that defense counsel made
effective and efficient use of the limited time the court allotted for voir dire by inquiring into
relevant and accepted areas. However, the State charges defense counsel did not properly manage
his time during voir dire and appeared to deliberately waste time on inappropriate matters in an
attempt to create an appellate issue. The State in its brief further argues:


 A careful examination of the record demonstrates that Appellant's trial
counsel never had an intent to manage his time within the pre-established 45-minute
limitations. Perhaps the best evidence of this is trial counsel's investment of nearly
20 percent of his time (six of his 37 pages of the voir dire record) speaking to the
panel about private religious matters, including professing his own personal belief
in Jesus, the Bible, and the actual existence of demons. Not only was this
theological diatribe extremely inappropriate in a judicial setting, it also
demonstrates counsel's complete disregard for the trial court's previously mandated
time limits. Furthermore at the end of his allotted time, counsel did not make a
reasonable request for a little more time, but rather asked for another 45 minutes,
no doubt counting on the trial court being unwilling to grant this inane plea for
double the amount of time given to the State.

 The record is clear that the trial court was not amused at trial counsel's time
management during voir dire, as shown by the following exchange which occurred
at the end of trial counsel's time:


Mr. Parks: Judge, may we approach the bench? We've run into some difficulty. 
We have several who have announced that they are having a problem
with either expert testimony or the insanity defense. But there was
one other issue that was going to create problems, police officer
testimony, that we feel compelled to ask for more time, additional
time to question the jurors individually.


The Court: Counsel, I told you when you got started that you had 45 minutes to
decide, and how you've chosen to use that is something that I can't
control. But I can see that what you're asking for is at least another
hour and a half, and I think that's an unreasonable use of your time
and the Court's time and the jury's time, so I'm going to deny your
request.


 Trial counsel's behavior, along with his carefully scripted bill of exception,
clearly shows how the entire jury selection process was for defense a cleverly
orchestrated event, calculated not so much for eliciting a timely and relevant
dialogue with the jury panel, but more so for the purpose manipulating the record
in an attempt to create reversible error.



 To decide whether the first Ratliff requirement was met, we have reviewed the
entire record to determine whether defense counsel unreasonably and inappropriately prolonged
jury voir dire. The State is very critical of defense counsel's use of as much as six pages of its
37-page voir dire in a "theological diatribe" contending that this demonstrated defense counsel's
"disregard for the trial court's previously mandated time limits." The State has failed to point out
any other specific instance which in its view defense counsel "never had any intent to manage his
time within the pre-established 45-minute limitations."

 During voir dire, defense counsel explained a defendant's right not to testify and
explored the reasons why an inarticulate defendant might for that or other reasons not testify. 
Counsel then asked the panel members if they could think of reasons why a defendant might not
testify and asked for examples of defendants who had not testified. A panel member mentioned
a New York case in which a defendant who had taken hostages did not testify. Another panel
member mentioned "O. J.," and another panel member mentioned Jesus Christ. There was then
a discussion of Jesus being tempted and offered a pact by the devil; defense counsel then asked the
panel members whether they believed that scriptural account. A considerable amount of the
psychiatrist's and psychologists' testimony related to appellant's strict religious upbringing, his
satanic beliefs, and his possession by demons.

 A review of the State's voir dire shows that the prosecutor's discussion and
questions concerning religion and religious beliefs also required six pages of the record. The
prosecutor discussed his Christian mother's belief in prayer. He discussed the beliefs of Baptists,
Catholics, and Hindus. He discussed belief in angels, and belief in and the worship of the devil. 
The prosecutor seemed to be making a legitimate point that although people had different religious
beliefs they were not necessarily insane and that those who worshipped the devil are not
necessarily for that reason legally insane.

 It would appear that appellant's insanity defense involving devil worship and his
professed demonic possession would justify the defense counsel's voir dire that is criticized by the
State. Defense counsel's voir dire, in the context of this case, was not unreasonable or
inappropriate and was not an attempt to unjustifiably prolong the voir dire. The length of a trial,
its uniqueness, and its complexity may not be entirely foreseeable, but these possibilities are
matters for consideration in setting and maintaining arbitrary time limits for jury voir dire. Here,
there were harbingers indicating a risk in setting and maintaining arbitrary jury voir dire time
limits. In view of the circumstances revealed by the entire record, we hold that all of the
requirements of Ratliff were met, and it has been shown that the limitation on voir dire in this case
constituted an abuse of discretion. Appellant's first point of error is sustained.

 It is most unlikely that in the event of another trial the matters presented in
appellant's remaining points of error would reoccur; therefore, we will not discuss those matters.

 The judgment of the trial court is reversed, and the cause is remanded to the trial
court.



 

 Carl E. F. Dally, Justice

Before Justices Jones, B. A. Smith and Dally*

Reversed and Remanded

Filed: August 31, 1999

Publish



* Before Carl E. F. Dally, Judge (retired), Court of Criminal Appeals, sitting by assignment. 
See Tex. Gov't Code Ann. § 74.003(b) (West 1998).



e with the jury panel, but more so for the purpose manipulating the record
in an attempt to create reversible error.



 To decide whether the first Ratliff requirement was met, we have reviewed the
entire record to determine whether defense counsel unreasonably and inappropriately prolonged
jury voir dire. The State is very critical of defense counsel's use of as much as six pages of its
37-page voir dire in a "theological diatribe" contending that this demonstrated defense counsel's
"disregard for the trial court's previously mandated time limits." The State has failed to point out
any other specific instance which in its view defense counsel "never had any intent to manage his
time within the pre-established 45-minute limitations."

 During voir dire, defense counsel explained a defendant's right not to testify and
explored the reasons why an inarticulate defendant might for that or other reasons not testify. 
Counsel then asked the panel members if they could think of reasons why a defendant might not
testify and asked for examples of defendants who had not testified. A panel member mentioned
a New York case in which a defendant who had taken hostages did not testify. Another panel
member mentioned "O. J.," and another panel member mentioned Jesus Christ. There was then
a discussion of Jesus being tempted and offered a pact by the devil; defense counsel then asked the
panel members whether they believed that scriptural account. A considerable amount of the
psychiatrist's and psychologists' testimony related to appellant's strict religious upbringing, his
satanic beliefs, and his possession by demons.

 A review of the State's voir dire shows that the prosecutor's discussion and
questions concerning religion and religious beliefs also required six pages of the record. The
prosecutor discussed his Christian mother's belief in prayer. He discussed the beliefs of Baptists,
Catholics, and Hindus. He discussed belief in angels, and belief in and the worship of the devil. 
The prosecutor seemed to be making a legitimate point that although people had different religious
beliefs they were not necessarily insane and that those who worshipped the devil are not
necessarily for that reason legally insane.

 It would appear that appellant's insanity defense involving devil worship and his
professed demonic possession would justify the defense counsel's voir dire that is criticized by the
State. Defense counsel's voir dire, in the context of this case, was not unreasonable or
inappropriate and was not an attempt to unjustifiably prolong the voir dire. The length of a trial,
its uniqueness, and its complexity may not be entirely foreseeable, but these possibilities are
matters for consideration in setting and maintaining arbitrary time limits for jury voir dire. Here,
there were harbingers indicating a risk in setting and maintaining arbitrary jury voir dire time
limits. In view of the circumstances revealed by the entire record, we hold that all of the
requirements of Ratliff were met, and it has been shown that the limitation on voir dire in this case
constituted an abuse of discretion. Appellant's first point of error is sustained.

 It is most unlikely that in the event of another trial the matters presented in
appellant's remaining points of error would reoccur; therefore, we will not discuss those matters.

 The judgment of the trial court is reversed, and the cause is remanded to the trial
court.